**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| MARCUS MCGEE, individually and on behalf of all others similarly situated | Civil Action No. 8:26-cv-170 |
| *Plaintiff,* | |
| vs. | **BRIEF IN SUPPORT OF MOTION TO DISMISS** |
| MORTGAGEPROS, LLC | |
| *Defendant.* | |

Defendant MortgagePros, LLC d/b/a ("MPros" or "Defendant"), states the following in this Brief in Support of Motion to Dismiss the putative Class Action Complaint of Marcus McGee ("McGee" or "Plaintiff") for failure to state a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") or, alternatively, to strike and/or dismiss the putative class allegations.

**PRELIMINARY STATEMENT**

McGee brings a putative class action against MPros, alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA") and seeking monetary, injunctive, and declaratory relief. McGee's claims are brought pursuant to section 227(c)(5) of the TCPA, purporting to arise out of violations of 47 C.F.R. § 64.1200(d). However, Plaintiffs' claims are subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for the following reasons:

First, the Complaint's allegations demonstrate that MPros complied with the opt-out requirements within the timeframe provided by 47 C.F.R. § 64.1200(d)(3). That compliance renders every communication identified in the Complaint non-actionable.

Second, a plain reading of the TCPA's statutory text illustrates that U.S.C. § 227(c)(5)'s private right of action unambiguously applies only to telephone calls, not to the text messages at

issue. Specifically, the TCPA provides a limited right of action to any person who "has received more than one ***telephone call*** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." (emphasis added). Nowhere in the text of the § 227(c)(5)'s private right of action is the term "text message" used and nowhere in the Complaint does Plaintiff allege the receipt of anything other than a text message.

Third, because the Complaint admits that he did not receive any text messages from MPros after February 2, 2026, McGee fails to plausibly plead that MPros does not maintain procedures for recording requests not to be contacted or that it fails to maintain an internal do-not- call list.

Alternatively, because Plaintiff's claims are inherently incapable of class certification for multiple independently dispositive reasons, MPros respectfully requests that the Court strike the class allegations and spare MPros the burden, expense, and the *in terrorem* threat that even meritless putative class actions present. *See Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001) (explaining that class actions can have an *in terrorem* effect because "the enormous size of the potential liability [imposes] an intense pressure to settle . . . because the risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low) (quoting *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7h Cir, 1995) (Posner, J.) (internal quotation marks omitted).

## LEGAL STANDARD

To survive a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A claim should only be considered facially plausible when the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To satisfy the plausibility standard, the plaintiff

must set forth "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While a plaintiff is not obligated to plead factual allegations in great detail, "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In ruling on a 12(b)(6) motion to dismiss, materials embraced by the pleadings, as well as exhibits attached to the pleadings and matters of public record, may all be considered. *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010).

Moreover, motions to strike class allegations are analyzed under Rule 23. *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 284 F.R.D. 238, 243 (E.D. Pa. 2012); *see also Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) (collecting authorities). Accordingly, the standard for evaluating whether class allegations should be stricken is the same as that for class certification, and the burden is on the plaintiff to demonstrate that the elements of Rule 23 are satisfied. *Abraham v. Ocwen Loan Servicing, LLC* , 2017 WL 2734280 (E.D. OA. June 26, 2017).

## ARGUMENT

### I.  MPROS COMPLIED WITH 47 C.F.R. § 64.1200(d)

47 C.F.R. § 64.1200(d) provides that "[n]o person or entity shall initiate . . . any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity."  As relevant here, among the mandatory minimum procedures required by the regulation, subsection (3) provides that "[p]ersons or entities making such calls . . . must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made.  This period may not exceed ten (10) business days from the receipt of such request . . . ." *Id.*

The Complaint itself demonstrates that Plaintiff's opt-out request was not only honored

3

within the 10 business days permitted for the processing of the request, but that it was honored reasonably within that 10 business day timeframe. Specifically, Plaintiff alleges that he purportedly requested to opt-out from the receipt of telephone solicitations on January 26, 2026. *See* ECF No. 1 ¶¶ 15, 35. And while the tenth business day following receipt of that request would have been February 9, 2026, Plaintiff readily admits that the last message received was on February 2, 2026. *Id.* at ¶ 17. Thus, by Plaintiff's own admission, his opt-out was honored in 5 business days. This 5 business day timeframe was both equal to one calendar week (in contrast to the two calendar weeks envisioned by the regulation) and is five business days sooner than the deadline set by the regulation. By any measure, this is compliance with both the letter and spirit of 47 C.F.R. § 64.1200(d)(3).

Consequently, none of the text messages identified in the Complaint as having purportedly been received by Plaintiff are actionable because 47 U.S.C. § 227(c)(5) unambiguously provides a right of action only for those telephone calls which were received in violation of the regulations prescribed under 47 U.S.C. § 227(c) and none of the messages at issue were received in violation of 47 C.F.R. §64.1200(d).

By bringing suit over messages that were sent within the time permitted to process opt-out requests, Plaintiff seemingly seeks to hold MPros liable for not immediately processing the opt-out. However, that is not a standard mandated by the regulation. To be sure, the current version of 47 C.F.R. § 64.1200(d)(3) is the third iteration of the opt-out requirement regulation and none of the three versions have ever deemed it a violation to fail to process an opt-out request immediately, nor have any versions mandated immediate or same day processing of such requests. In fact, as part of the most recent amendment to 47 C.F.R. § 64.1200(d)(3), which adjusted the opt-out processing timeframe down from 30 calendar days to 10 business days, the Federal

4

Communications Commission ("FCC") explained precisely why it *abandoned* its proposed 24-hour timeframe, stating as follows:

> "The Commission revises its proposed 24-hour timeframe in response to commenter concerns that the proposed 24-hour timeframe would not be feasible in many instances. The Commission is persuaded by the record, including comments from consumer organizations, that a longer timeframe is justified to ensure that entities, including smaller entities, have a reasonable opportunity to process do-not-call and revocation requests. The Commission believes this outcome adequately balances the burdens on callers with the privacy protections afforded to consumers, with a "no longer than 10 business days" backstop to ensure that consumers have certainty about when they can expect unwanted communications to stop."

89 FR 15756, 15759 (2024)

The Complaint's allegations demonstrate that the amount of time that it took MPros to honor Plaintiff's opt-out request was entirely consistent with the policy considerations that the FCC identified when enacting the current version of 47 C.F.R. § 64.1200(d)(3). MPros not only respected Plaintiff's privacy by not contacting him after the regulation's 10-business day timeframe had passed, but it exceeded the protections afforded by the regulation by ceasing contact within half of that time. MPros is the archetypal small business which the FCC had in mind when drafting the current iteration of 47 C.F.R. § 64.1200(d)(3). Its compliance with the regulation should be recognized as a model of regulatory fidelity, not met with a baseless lawsuit by an individual whose privacy was faithfully respected.

MPros' timely honoring of Plaintiff's opt-out request well within the timeframe demanded by 47 C.F.R. § 64.1200(d)(3) demonstrates MPros' compliance with the regulation. For that reason alone, McGee cannot maintain the cause of action and MPros is entitled to dismissal of the Complaint.

II.    **THE TCPA'S PRIVATE RIGHT OF ACTION DOES NOT APPLY TO TEXT MESSAGES**

The private right of action codified at 47 U.S.C. § 227(c)(5) is unambiguously limited to telephone calls and does not extend to the text messages received by Plaintiff. Plaintiffs' claims must be dismissed as a result.

A. **The Statute's Plain Language Is Dispositive That There Is No Private Right of Action Under § 227(c)(5) for Receipt of Text Messages.**

When interpreting the meaning of a statute, the Court begins with the text itself. *Avila v. Bondi*, No. 2026 U.S. Dist. LEXIS 2999, *5 (D. Neb. Jan. 8, 2026) (citing *Union Pac. R.R. Co. v. United States*, 865 F.3d 1045, 1048 (8th Cir. 2017)).  The text of 47 U.S.C. § 227(c)(5) is express and unambiguous in that it affords a private right of action only to "[a] person who has received more than one ***telephone call*** within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . ." (emphasis added).  This provision does not include the words "text message," "message," or even "telephone solicitation" (which is statutorily defined to include messages).  Thus, any determination that the provision's scope extends to text messages would necessarily require the insertion of language that the statute simply does not include.

What is more, the Supreme Court recently reiterated that a "statute's meaning is fixed at the time of enactment." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) (citing *Wis. Cent. Ltd. v. U.S.*, 585 U.S. 274, 284 (2018) ("Written laws are meant to be understood and lived by . . . That is why it is a fundamental cannon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute.") (internal quotations and citation omitted)); *see also Sanzone v. Mercy Health*, 954 F.3d 1031, 1040 (8th Cir. 2020) ("A court's job is to interpret the words consistent with their ordinary meaning at the time Congress enacted the statute."). Thus, to properly

6

interpret the term "telephone call" found in § 227(c)(5), while it is helpful to recognize that no ordinary person in the year 2026 would understand the term "telephone call" to mean "text message," it is dispositive to recognize that when the TCPA was enacted in 1991 no ordinary person would have even known what a text message was, let alone understood it to be synonymous with a telephone call.

Additionally, it is equally noteworthy that Congress has amended the TCPA several times since its enactment which have resulted in the statute's explicit inclusion of the term text message. However, those amendments have affected other provisions of the statute (specifically subsections (e),[1] (i), and (j) [2]) - neither § 227(c) generally nor § 227(c)(5) specifically have been similarly amended to include the term.

While amendments to sections other than § 227(c) or § 227(c)(5) speak to congressional intent to treat the scope of different sections differently, the substance of the amendments themselves also speak to congressional understanding of the communications technology regulated by the TCPA.  Specifically, as a result of Congress's amendments to the TCPA, the law contains several examples of the sharp distinction drawn between a call and a text message, underscoring Congress's understanding that a call and a text message are not one in the same. By way of example, Congress amended 47 U.S.C. § 227(e)(8)(A) and (B) to include the same identical phrasing: "a call made using a voice service *or* a text message sent using a text messaging service." (emphasis added). Meanwhile, 47 U.S.C. § 227(i)(1)(A) reads "a call made *or* text message sent . . ." Similarly, 47 U.S.C. § 227(i)(1)(B) now reads "a call *or* text message . . ." (emphases added).  The distinction

---

[1] The TCPA was amended in 2018 to include subsection (e)'s text message language. *See* Pub. L. 115-141.

[2] The TCPA was amended in 2019 to include the text message language in sections (i) and (j). *See* Pub. L. 116-105.

reflected in those provisions reinforces a pre-existing distinction that has long been found in the TCPA at 47 U.S.C. § 227(a)(4), which defines "telephone solicitation" to mean "the initiation of a telephone call or message . . ."

The TCPA thus contains language through which highlights that when Congress wants a provision of the statute to capture within its scope a message (text or otherwise), it has demonstrated the wherewithal to draft language to accomplish that goal. The conclusion to be drawn is that when telephone call is used in isolation, Congress intends for it to not include messages. *See Davis v. CVS Pharm. Inc.,* 2025 U.S. Dist. LEXIS 167366 (N.D. Fla. Aug. 26, 2025).

Congress has demonstrated that it intended to limit § 227(c)(5)'s private right of action to telephone calls only, through the carefully chosen words drafted into the statute and the actions it has taken to revise the statute subsequent to its enactment. While Congress has amended the TCPA on multiple occasions to ensure that the scope of various of the statute's restrictions was broad enough to explicitly cover both telephone calls and text messages, it has notably left § 227(c)(5) untouched in this respect.  As a result, one portion of the statute uses the term(s) "call or text message" while another merely uses the term "telephone call."  The only permissible conclusion to reach from this difference is that the latter term is intentionally narrower than the former. *See Pulsifer v. United States*, 601 U.S. 124, 149, 144 S. Ct. 718, 218 L. Ed. 2d 77 (2024) ("In a given statute, . . . different terms usually have different meanings."); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004) ("When the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). Simply stated, telephone call as used in § 227(c)(5) does not include text messages.

**B.** **The Court Is Not Required to Defer to Agency Interpretation of the TCPA.**

In *Loper Bright*, through which the Supreme Court overturned the *Chevron* deference doctrine, the Supreme Court reiterated that it is the traditional function of courts "to decide whether the law means what the agency says." 603 U.S. at 392. Thus, notwithstanding the FCC's inclusion in its 2003 rulemaking that the term "call" for TCPA purposes "encompasses both voice calls and text calls," 18 FCC Rcd. 14014 ¶ 165 (2003) (the "2003 TCPA Order"), the Court need not defer to the interpretation.[3]

In the 2003 TCPA Order, the FCC did not cite to any statutory support for its conclusion that the term "call" encompasses a text message.[4] Of course, the reason for that silence is readily apparent – no statutory basis for that conclusion exists. The FCC instead proclaimed that the interpretation was consistent with its understanding of the TCPA's policy goals. 18 FCC Rcd. 14014 ¶ 165. Because the language of the TCPA is plain and unambiguous, however, the statutory text must prevail. *See BedRoc Ltd. v. United States,* 541 U.S. 176, 183, 124 S. Ct. 1587, 158 L. Ed. 2d 338 (2004) ("The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." (internal

---

[3] To the extent that the Hobbs Act might have otherwise compelled the Court to defer to the FCC's interpretation even after *Loper Bright*, that shackle has been unbound as well. In M*cLaughlin Chiropractic Assocs. V. McKesson Corp.*, 606 U.S. 146, 168 (2025), the Supreme Court held that in enforcement proceedings, district courts are not "bound by the FCC's interpretation of the TCPA," and that instead it "should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation."

[4] Moreover, the 2003 Order which purported to bring text messages within the definition of "call" did so within the context of § 227(b), not § 227(c). Underscoring this point are that the FCC (1) explicitly mentioned "automatic telephone dialing system," "artificial or prerecorded message," and "automated or prerecorded telephone calls," and (2) cited only to 47 U.S.C. § 227(b) and the implementing regulation of that provision, 47 C.F.R. 64.1200(a). *Jones v. Blackstone Med. Servs., LLC*, 2025 U.S. Dist. LEXIS 138371, at *11-12 (C.D. Ill. July 21, 2025).

quotation marks and citations omitted)).

It is the Court that has the appropriate authority to interpret the TCPA's text, not the FCC. This has been reaffirmed by the Supreme Court in both *Loper Bright* and *McLaughlin Chiropractic*. While *McLaughlin Chiropractic* calls for "appropriate respect" to be afforded to the FCC's interpretation, the Court "can provide appropriate respect to [the] agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text." *Davis v. CVS Pharm, Inc.*, 797 F. Supp. 3d 1270, 1275 (N.D. Fla. 2025).

The FCC's policy-based interpretation cannot rewrite the TCPA's clear text. In fact, because this policy-based interpretation conflicts with the text, the Court should disregard it, exercise its own independent judgment, and appropriately conclude that the unambiguous terms of § 227(c)(5) do not apply to text messages.

### C. 47 C.F.R. § 64.1200(e) Does Not Extend 47 U.S.C. § 227(c)(5)'s Scope to Text Messages

47 C.F.R. § 64.1200(e) provides that "[t]he rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing or text message calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" For three distinct reasons, however, this provision does not alter the fact that 47 U.S.C. § 227(c)(5) does not apply to text messages.

First, the provision itself contains language limiting its scope: "to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153. 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.'" As indicated in note 4 above, the extent to which the FCC's 2003 TCPA Order described text messages was within the context

10

of § 227(b), not § 227(c). And so, by the FCC's own limitation, the provision does not serve as a mechanism to broaden the scope of 47 U.S.C. § 227(c)(5)'s coverage to text messages.

Second, and as explained in further detail below, Congress imposed a deadline by which the FCC was to prescribe rules purporting to "implement methods and procedures for protecting the privacy rights" of residential telephone subscribers. That deadline, set by 47 U.S.C. § 227(c)(2) to be not later than September 21, 1992, had long since passed by the time that the FCC had both amended 47 C.F.R. § 64.1200 to include subsection (e), 68 FR 44144 (2003), and then later revised the subsection to include the words "text message," 89 FR 5098 (2024). Consequently, the Court must refuse to apply it in a manner that rewrites the text of 47 U.S.C. § 227(c)(5), as the rule is otherwise void and unenforceable due to the FCC's lack of statutory authority to prescribe it.

Third, the FCC, like all other executive agencies, has no authority to rewrite the terms of legislation. "Atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 315 (11th Cir. 2025) (citing *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.")); and *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (observing that an agency's opinion that its rule is "good policy" "does not change the statute's text")).

The statutory text of 47 U.S.C. § 227(c)(5) is clear that the private right of action is conferred to recipients of one or more telephone calls, not to recipients of text messages. The FCC has no authority to dictate otherwise. *Ins. Mkt. Coal. Ltd.*, 127 F.4th at 315. As a result, the Court should reject any entreaty to enforce 47 C.F.R. § 64.1200(e) so as to rewrite the TCPA's clear statutory text.

11

> **i.      The FCC Had No Authority to Create A Private Right of Action for Text Messages**

In two separate provisions, Congress unequivocally limited the FCC's rulemaking authority under 47 U.S.C. § 227(c) in a manner that imposed a deadline by which the FCC was to prescribe § 227(c) regulations.

First, 47 U.S.C. § 227(c)(1) provides that "[w]ithin 120 days after enactment of this section [enacted Dec. 20, 1991], the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."

Second, 47 U.S.C. § 227(c)(2) then goes on to provide that "[n]ot later than 9 months after the date of enactment of this section [enacted Dec. 20, 1991], the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph . . .".

Through these two sections, Congress imposed two deadlines upon the FCC: (1) a rulemaking proceeding was to be initiated no later than April 18, 1992; and (2) that rulemaking proceeding was to be concluded and regulations to implement methods and procedures for protecting the privacy rights described in 47 U.S.C. § 227(c)(1) were to be prescribed no later than September 20, 1992.

Subsequent to the TCPA's enactment, on April 17, 1992, the FCC initiated a Notice of Proposed Rulemaking in which it proposed and sought comment on certain TCPA-related regulations. *See* 7 FCC Rcd. 2736 (1992). Thereafter, on September 17, 1992, the FCC adopted the initial rules to implement the TCPA, which were subsequently released on October 16, 1992 and published in the federal register thereafter on October 23, 1992. *See* FCC 92-443 and CC Docket No. 92-90. These rules comprise the universe of rules permissibly prescribed pursuant to

the statutory authority conferred on the FCC under § 227(c). Any other rules purporting to implement § 227(c) but which were (i) prescribed pursuant to a rulemaking proceeding which was initiated later than April 18, 1992 and/or (ii) promulgated later than September 20, 1992, were enacted by the FCC in excess of authority conferred upon it by the Congress to implement § 227(c).

The TCPA's other operative subsections demonstrate that Congress deliberately imposed the deadline set by § 227(c). One need only compare and contrast the time limitations included in §§ 227(c)(1) and (2) with the broad, perpetual grant of rulemaking authority of § 227(b)(2) ("The Commission shall prescribe regulations to implement the requirements of this subsection."), § 227(d)(2) ("The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require . . ."), § 227(d)(3) ("The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone."), and § 227(e)(3) ("The Commission shall prescribe regulations to implement this subsection.").

The time-limited rulemaking authority of § 227(c) shares a much closer resemblance to the rulemaking authority conferred by § 227(i)(1) and § 227(j)(1), both of which also contain specific deadlines by which Congress mandated any rules pursuant to those grants of authority be prescribed. *See* § 227(i)(1) ("Not later than 18 months after the date of the enactment of this subsection [enacted Dec. 30, 2019], the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to . . .") and § 227(j)(1) ("Not later than 1 year after the date of the enactment of this subsection [enacted Dec. 30, 2019], shall take a final agency action to ensure the robocall blocking services provided on an opt-out or opt-in basis pursuant to the Declaratory Ruling of the Commission in the matter of Advanced Methods to Target and Eliminate Unlawful

Robocalls (CG Docket No. 17-59; FCC 19-51; adopted on June 6, 2019).").

It was only in 2023 that the FCC for the first time included text messages in its internal do-not-call regulations. *See* 2023 TCPA Order, 38 FCC Rcd. 12247 ¶ 26. The FCC explicitly acknowledged the recency of the change to its policy prescription, stating that "combating unwanted and illegal text messages is a comparatively new focus." 2023 TCPA Order, 38 FCC Rcd. 12247 ¶ 5. The FCC further noted in the 2023 TCPA Order that it had only "interpreted 'call' in section 227(b)(1)(A) of the [TCPA] to include both voice calls and text messages." *Id.* ¶ 5 & n.8.

§227(b)(2), however, confers on the FCC perpetual rulemaking authority to implement subsection (b). Not only is the grant of rulemaking authority under TCPA subsection (c) time-limited rather than perpetual, it is for the explicit purpose of implementing methods and procedures for protecting privacy rights. An Orwellian reclassification of one form of communication (text message) as another (telephone call) *may* be an appropriate way to implement §227(b), a subsection of the TCPA designed to prevent the placement of calls or use of communications technologies, but it is decidedly neither a method nor a procedure to enhance subscriber privacy rights. The FCC had no statutory authority to attempt to expand the regulations implementing § 227(c) to cover text messages, and its attempts to do so exceeded any grant of rulemaking authority otherwise conferred upon it by Congress.

The result of the FCC's excesses is that McGee may not pursue his TCPA claims against MPros as part of this enforcement proceeding, and his claims must be dismissed accordingly.

## III. PLAINTIFF DOES NOT PLAUSIBLY ALLEGE THAT MPROS FAILED TO MAINTAIN AN INTERNAL DO-NOT-CALL LIST

Even if the Court determines that text messages are telephone calls for purposes of § 227(c)(5)'s private right of action, McGee still fails to plausibly allege a claim for violation of

14

47 C.F.R. § 64.1200(d).

McGee alleges that he received only two additional text messages after he opted-out on January 26, 2026 - one on January 28, 2026 and another on February 2, 2026. *See* ECF No. 1, ¶ 17. Notwithstanding the fact that the very allegations in the Complaint demonstrate MPros' compliance with 47 C.F.R. § 64.1200(d)(3), the only plausible inference to glean from the Complaint's allegations is that MPros does maintain internal do-not-call procedures and those procedures worked as intended. McGee was never contacted again following 10 business days after receipt of his opt-out request (in fact he was never contacted again after only 5 business days following the opt-out). McGee therefore not only did not suffer any alleged injury from a purported failure to maintain internal do-not-call procedures, he actually gained a tangible benefit from MPros' maintenance of those procedures by receiving no further contact from MPros after February 2, 2026.

## IV.    THE CLASS CLAIMS MUST BE STRIKEN

Pursuant to Fed. R. Civ. P. 12(f), the Court has the authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained. *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080 (8th Cir. 2021) ("It is sensible . . . to permit class allegations to be stricken at the pleading stage if it is apparent from the pleadings that the class cannot be certified because unsupportable class allegations bring impertinent materials into the pleadings and permitted such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained.") (internal quotations omitted).

In the event that the Court does not otherwise dismiss Plaintiff's claims, it should alternatively strike the putative class claims because (1) the class is defined so broadly that it necessarily would encompass individuals who have no claims; (2) the class is defined so broadly

15

that it does not account for changes in the law which occurred during the relevant statute of limitations period; and (3) certification will never be appropriate given that individual inquires would be required to prove a core element of MPros' prospective liability.

### 1. The Putative Class's Broad Definition Would Capture Individuals Without a Claim

The text of 47 U.S.C. § 227(c)(5) is express and unambiguous in that affords a private right of action only to "[a] person who has received **more than one** telephone call **within any 12-month period** by or on behalf of the same entity in violation of the regulations prescribed under this subsection . . ." (emphasis added). Nevertheless, the class is defined to be "[a]ll persons in the United States who, within the four years prior to the filing of this Complaint, were sent a text message from Defendant or anyone on Defendant's behalf, to said person's residential telephone number *after* making a request to Defendant to not receive future text messages." ECF No. 1. ¶ 44. In multiple ways, the overbreadth of this definition will capture individuals without a claim.

First, assuming that receipt of text messages in general is an appropriate predicate for a claim pursuant to § 227(c)(5), the receipt of only one text message does not provide a person with statutory standing to bring a claim. The statute is explicit that as a threshold requirement for statutory standing, the person must receive two or more. Thus, when defined to include persons who received "a text message," the class will definitionally include persons who do not have standing to bring claims pursuant to § 227(c)(5).

Further complicating matters, the FCC has provided that not all text messages sent subsequent to a person's opt-out request are actionable. There is a notable exception from the regulation's application for messages which confirm a consumer's request that no further text messages be sent. The FCC specifically codified this as part of the rulemaking which enacted the current iteration of 47 C.F.R. 64.1200(d)(3) ("The Commission codifies the *Soundbite Declaratory*

16

*Ruling* which clarified that a one-time text message confirming a consumer's request that no further text messages be sent does not violate the TCPA or the Commission's rules as long as the confirmation text merely confirms the called party's opt-out request and does not include any marketing or promotional information, and the text is the only additional message send to the called party after receipt of the opt-out request."). 89 FR 15756, 15759 (2024).

Finally, it is not a given that even receipt of two text message is a sufficient predicate for statutory standing for claims pursuant to § 227(c)(5). This is because the statute is equally explicit that the calls must have been received within the same 12-month period to invoke the private right of action. Any lapse of 12-months between two calls/messages serves to reset the clock, and any individual who received two messages during a timeframe exceeding 12-months would be without statutory standing to bring claims pursuant to pursuant to § 227(c)(5).

All of which is to say that class membership based on the receipt of a single text message following an opt-out request is guaranteed to capture within its scopes a material number of persons who do not have statutory standing to pursue claims pursuant § 227(c)(5). The class claims should be stricken accordingly.

2. *The Relevant Law Has Changed in Multiple Ways During the Class Period*

Two different changes to the law which occurred during the class period render the Class's definition inappropriate for certification.

First, as indicated above, in a rule adopted on February 15, 2024, and released on February 16, 2024, the FCC amended 47 C.F.R. 64.1200(d)(3) to shorten from 30 calendar days to 10 business days the timeframe within which to honor an opt-out request. The opt-out rules applicable to MPros' interactions with Plaintiff would therefore materially differ from the rules applicable to nearly half of the relevant class period.

Likewise, also as indicated above, to the extent that 47 C.F.R. § 64.1200(e) serves as a basis for concluding that 47 U.S.C. § 227(c)(5)'s private right of action extends to the receipt of text messages, that regulation was only amended to purportedly extend 47 C.F.R. 64.1200(d)'s scope to text messages on December 18, 2023. *See* 38 FCC Rcd 12247. As such, the change in law during the class period results in a material number of putative class members whose purported claims would be governed by a separate set of rules applicable to the messages they received than the rules in place when Plaintiff received his.

These variations in the law ultimately predominate over any common issues and warrant striking the class claims as a class could never be certified under the circumstances. *See Elson v. Black*, 56 F.4h 1002 (5th Cir. 2023) (variations in the law "swamp" any common issues and defeat predominance).

### 3. *Individual Factual Inquiries Will Predominate Given the Nature of the Claims*

Where individual inquiries are required to prove a core element of liability, courts find that individual questions predominate over common questions. *See Andrews v. Plains All American Pipeline, L.P.*, 777 Fed. App. 889, 892 (9th Cir. 2019) ("These individualized inquires go to key elements of the class's claims, and the district court abused its discretion by concluding that this disparity would affect only damage calculations"); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (no predominance where "the district could would be tasked with filtering out those members to whom [the defendant] was not liable"); *see also Marion v. Werner Enters.*, 2009 U.S. Dist. LEXIS 101706, at *31 (D. Neb. Sept. 9, 2009) ("In the instant case, the multitude of individual inquiries the court would first have to make prior to determining whether common issues exist, prove such a case would not be efficiently adjudicated as a class action. The court finds resolution of the claims, at least as to the defendants'

18

liability to each proposed class member, through a class action would be, under the circumstances, an inefficient allocation of judicial resources. A class action is not a superior method for resolution of the issues when compared to individual litigation due to the individualized nature of the claims and defense related to each proposed class member.").

MPros steadfastly maintains that by processing and honoring Plaintiff's opt-out request in 5 business days, it complied with 47 C.F.R. 64.1200(d)(3). To the extent that MPros could be subject to liability to Plaintiff for an alleged violation of that regulation, however, any such liability determination rests entirely upon resolving the highly subjective and individualized question of whether the amount of time within the regulation's 10-business day timeframe in which MPros honored Plaintiff's opt-out request was reasonable or not. There is no one objective factor which can resolve that question. Even for just Plaintiff's individual claims, it involves fact intensive determinations as to, at least, whether five business days is a reasonable amount of time to honor an opt-out request, whether five business days is a reasonable amount of time to honor an opt-out request relative to the 10 business days the FCC otherwise proscribes for honoring requests, and what is the standard against which to measure whether that amount of time was reasonable.

Extrapolating resolution of these questions on a class wide basis is impossible, as the fundamental question of whether an opt-out was honored in a reasonable amount of time is incapable of a common answer. Instead, it requires consideration of a number of variable factors such as: how many messages subsequent to the opt out request did an individual receive, over what time period were they received, what is the appropriate sliding scale of the number of messages received over how many days to reach the reasonableness determination, is that determination affected by the number of messages received subsequent to an opt-out request and further yet how is it affected by the amount of time which passes between the first such subsequent message and

19

the second (or the first and the last in the case of more than two).

Should a fact finder need to decide whether MPros honored Plaintiff's opt-out in a reasonable amount of time, the  difficulty in reaching that determination only serves to underscore the impossibility of the task in attempting to do so on a class wide basis.  When standards of reasonableness are at issue, courts routinely decline to certify a class given the individualized inquiries required to arrive at liability determinations.  *See, e.g. In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 2011 U.S. Dist. LEXIS 150015, at *7 (W.D. Mo. Dec. 22, 2011) (finding that whether notice was provided within a reasonable amount of time is an inquiry that requires individualized inquiries); *In re Dollar Gen. Corp.*, 2019 U.S. Dist. LEXIS 58082 (W.D. Mo. Mar. 21, 2019) (same).  This case is no different, and the Court should take the opportunity to strike the class claims early to spare MPros of the prejudicial burden, expense, and the *in terrorem* threat that even meritless putative class actions present.  *See Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 168 (3d Cir. 2001) (explaining that class actions can have an *in terrorem* effect because "the enormous size of the potential liability [imposes] an intense pressure to settle . . . because the risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low) (quoting *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7h Cir, 1995) (Posner, J.) (internal quotation marks omitted).

## V.      CONCLUSION

For the foregoing reasons, MPros respectfully requests that the Court grant this motion, dismiss the Complaint or, alternatively, strike the class claims, award MPros fees and costs to the fullest extent permitted by law, and grant MPros such further and additional relief as the Court deems just and proper.

DATED:  May 18, 2026                                    Respectfully submitted,

**KLEIN MOYNIHAN TURCO LLP**

*Attorneys for Defendant MortgagePros, LLC*

By: /s/ *Neil E. Asnen*
Neil E. Asnen
450 7th Avenue – 40th Floor
New York, NY 10123
Telephone: (212) 246-0900
Email: nasnen@kleinmoynihan.com

**CERTIFICATE OF COMPLIANCE**

I certify that Defendant's Brief in Support of Its Motion to Dismiss complies with LR 7.1(d)(1) and contains 6,493 words, inclusive of all text, the caption, headings, footnotes, and quotations. In making the within certification, I used the Microsoft Word software, version 2604.

/s/ *Neil E. Asnen*
Neil E. Asnen

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 18, 2026, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

<u>/s/ *Neil E. Asnen*</u>
Neil E. Asnen